# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| ANTONIO M. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:07-CV-155 |
| | ) | |
| v. | ) | |
| | ) | |
| SGT. STEVEN SCOTT, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

Early on the morning of January 19, 2006, Plaintiff Antonio M. Johnson fled from Marion, Indiana, police officer Steven Scott and his German Shepherd police dog, Archer, first in a car and then on foot, until eventually cornered and handcuffed following a brief struggle. Because Johnson claims that his arrest was accomplished with excessive force (both before and after handcuffing), he has sued Scott under 42 U.S.C. § 1983, alleging a violation of his Fourth and Fourteenth Amendment rights.[1] In essence, Johnson argues that because he was eventually cornered and surrendered, raising his arms in the air and stating, "I give up," no force was necessary and that by deploying Archer and tackling Johnson, Scott created a situation where unnecessary force was applied.

On May 27, 2008, Scott filed a motion for summary judgment (Docket # 39) that contained excerpts from Johnson's deposition, arguing that he did not use excessive force in

---

[1] Accordingly, subject matter jurisdiction arises under 28 U.S.C. §§ 1331 and 1343. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

apprehending Scott with Archer's assistance. Scott further asserted that even if there was arguably a violation of the Fourth Amendment, he is still entitled to qualified immunity because under the circumstances he faced, no reasonable officer would have thought his conduct was unlawful.

Johnson filed a response in opposition to the motion for summary judgment on June 26, 2008, that included Johnson's own affidavit. (Docket # 43.) On July 17, 2008, Scott filed a reply brief, together with a motion to strike at least some of the paragraphs of Johnson's affidavit. (Docket # 47, 48.) Johnson filed a response (Docket # 53) to the motion to strike on July 24, 2008; Scott did not file a reply.

Because Johnson's opposition to the motion for summary judgment relies upon evidence subject to the motion to strike, that matter will be addressed first. For the following reasons, Scott's motion to strike will be GRANTED IN PART and DENIED IN PART, and his motion for summary judgment will be GRANTED.

## II. MOTION TO STRIKE

Scott first argues that some of Johnson's statements in his affidavit should be stricken because they are directly contrary to his earlier deposition testimony and he does nothing to explain why.

The rule, of course, is well settled; "a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001); *Cowan v. Prudential Ins. Co. of Am.*, 141 F.3d 751, 756 (7th Cir. 1998) (stating that parties may not defeat summary judgment by creating "'sham' issues of fact with affidavits that

contradict their prior depositions"). If a party were permitted "to create a genuine issue of material fact by changing his prior testimony: the very purpose of the summary judgment motion--to weed out unfounded claims, specious denials, and sham defenses--would be severely undercut." *United States v. Torres*, 142 F.3d 962, 968 (7th Cir. 1998). Thus, where the contents of an affidavit conflict with the substance of earlier deposition testimony, the court should consider the deposition for summary judgment purposes, and the affidavit should be disregarded "unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Amadio*, 238 F.3d at 926.

To invoke this rule, however, the party objecting to the affidavit must show a direct and specific conflict between the affidavit and the deposition testimony for which there is no plausible explanation such as confusion, ambiguity, refreshed recollection, or newly-discovered evidence. *See, e.g.*, *id*. (observing that affidavit contradicted specific answers to repeated and specific questions); *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170-72 (7th Cir. 1996); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995).

Scott suggests that all of Johnson's affidavit should be stricken, but singles out the following paragraphs in particular:

> 4. [I surrendered (*see* Johnson Aff. ¶ 3)], [b]ut Sgt. Scott sicced his dog on me anyway, and the dog bit me in the upper left arm, and while the dog was pulling me to the ground, Sgt. Scott tackled me by running at me and thumping my chest with [h]is forearm.
>
> 5. While on the ground I did not resist – I just did not want the dog to bite me anymore, but even after I was handcuffed, the dog let go of my arm and started to bite my left leg, and then the dog came back and started biting my left arm again, even after I was handcuffed.

3

> 6. During this time, Sgt. Scott kept hitting me between my shoulder blades and back of my head and neck, telling me to give him my other arm which I could not do because his dog had it in his mouth. And even after the dog let go of my arm (and then Sgt. Scott cuffed both my hands together), the dog was still allowed to start biting my leg and then went back up and started biting my arm – after I was handcuffed!

\* \* \*

> 8. Sgt. Scott continued to let his dog bite me even after I was handcuffed and after I was under the control of Sgt. Scott.

Specifically, Scott objects to paragraphs 5, 6 and 8 of Johnson's affidavit to the extent they assert and support one of Johnson's main contentions – that after he was handcuffed, Archer was either allowed to start biting him again (paragraphs 5 and 6), or was allowed to keep biting (paragraph 8).[2] (*See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Resp. Br.") at 5.)

What is most troubling, and what Johnson does not effectively explain, is how his testimony at both paragraphs 5 and 6 of his affidavit can possibly square with what he said at his deposition. Indeed, in both paragraphs of the affidavit Johnson contends that after he was handcuffed, Archer stopped biting his leg and started biting his arm again – facts he specifically disavowed in his deposition. (Johnson Dep. 34: 8-9 (Q: "The dog didn't bite you anymore [after the handcuffing and after he ceased biting the leg?"]; A: "no sir.").) This highlights a specific and direct conflict between Johnson's affidavit and his earlier deposition testimony, for which he offers no plausible explanation.[3] *See, e.g.*, *Amadio*, 238 F.3d at 926 (noting that affidavit

---

[2] Johnson's *pro se* Complaint, submitted under the pains and penalties of perjury in accordance with 28 U.S.C. § 1746, simply alleges that Archer bit him during the time that Scott was attempting to handcuff him. (Docket # 1.)

[3] Johnson argues in his sur-reply that any discrepancies between his affidavit and deposition "may be the result of Plaintiff having refreshed his recollection after reviewing the excerpts from his deposition . . . [and] may be the result of Plaintiff having refreshed his memory after having additional opportunities following his deposition to review the events . . . [.]" (Pl.'s Sur-Reply to Def.'s Reply Mem. 2.) The problem with these speculative assertions is that Johnson offers nothing to support them and tellingly, made no mention of refreshing his memory in his affidavit.

4

contradicted specific answers to repeated and specific questions). Consequently, these portions of Johnson's affidavit will be stricken.

Johnson, however, offers something slightly different at paragraph 8 of his affidavit and it can be read to square with his deposition; that is, that Archer continued to bite his leg until right after Johnson was handcuffed, at which point Scott told Archer to "Let go," and Archer then responded "pretty quick[ly]" by releasing Johnson's leg and never biting him again. (Johnson Dep. 32-34.) Since the affidavit is not in direct conflict with this deposition testimony, and because in both the affidavit and the deposition, Johnson is only apparently talking about a short interval of five or ten seconds (Johnson Dep. 33), the motion to strike will be denied for paragraph 8.

This ruling, however, does not really address or affect some of Johnson's remaining allegations of excessive force, which largely hinge on Johnson's contention that after he came to a fence too high to jump, he turned around, saw Scott and Archer, and put his hands up in the air and said, "I give up." Johnson contends that notwithstanding this obvious submission to Scott's authority, Archer was allowed to bite his left arm, which was followed almost immediately by Scott's tackling of him, followed still later by Scott hitting him in the back of the head and neck after Scott managed to get the handcuffs on his wrists.[4] (Resp. Br. 5.)

In connection with these allegations, the motion to strike challenges the contention first voiced by Johnson in paragraph 4 of his affidavit, that Scott commanded (*i.e.*, "sicced") Archer to bite him even though he had surrendered. The problem with Johnson's statement, which by the way is not in his *pro se* Complaint either, is that it runs directly counter to his deposition

---

[4] Although Johnson argues in his response brief that Scott hit him after he was handcuffed, his affidavit does not make this claim and his deposition testimony clearly absolves Scott of the allegation. (Johnson Dep. 34.)

testimony that he did not hear Scott say anything (*i.e.*, voice a dog command) until *after* Archer had grabbed his arm. (Johnson Dep. 26-27.) Since the deposition testimony prevails, this means that Johnson lacks any personal knowledge for the statement, Fed. R. Civ. P. 56(e)(1), and thus the phrase contained in paragraph 4 of Johnson's affidavit, "[b]ut Sgt. Scott sicced his dog on me anyway," must be stricken.[5]

One final point concerning the motion to strike remains – Johnson's assertion at paragraph 5 that while on the ground, and while Scott was trying to handcuff him, he "did not resist." Scott seems to believe that because Johnson admitted in his deposition that the two men rolled on the ground for some time before Johnson was successfully handcuffed, he concedes that he was resisting. Yet, this overlooks the fact (apparently uncontested) that one reason why the handcuffing took a little longer than usual was because Archer was holding Johnson's left arm. Accordingly, it is conceivable that Johnson was not resisting *per se*, and that his movements were in response to Archer's bites, as he claims in his affidavit. Accordingly, the motion to strike will be denied as to the phrase: "While on the ground I did not resist – I just did not want the dog to bite me anymore. . . [.]"

In sum, the Court will GRANT IN PART and DENY IN PART Scott's motion to strike; the motion will be denied with respect to the following testimony: paragraphs 1-3, for everything after the word "anyway" in paragraph 4, for the first two phrases in paragraph 5, for the first sentence in paragraph 6, and paragraphs 7 and 8. The Court now turns to Scott's motion for summary judgment.

---

[5] Johnson does not allege that Scott gave Archer some sort of non-verbal command or cue, and since Scott trailed behind Archer during the foot pursuit of Johnson, it is unlikely that he had any opportunity to do so.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Factual Background

Early on January 19, 2006, Johnson was at the Paradise Lounge in Marion, Indiana. (Johnson Dep. 12.) He soon left, however, because he was told that another patron intended to shoot him and that the police had been called. Apparently concerned about his own safety, and also because he was the subject of an active arrest warrant, Johnson left in a friend's white Chevrolet Caprice even though he did not have a driver's license. (Johnson Dep. 11.)

Johnson headed for his grandmother's house but on the way saw a police vehicle. At the same time, Scott was responding in his K-9 police car to a dispatch about a suspected shooting at the Paradise Lounge; in fact, he had just heard a radio transmission from another officer about a white Chevrolet Caprice that had just left the parking lot of the Paradise Lounge operated by a person allegedly involved in the shooting. (Scott Aff. ¶ 1.) Scott soon spied a vehicle matching that description driven by a black male he later learned was Johnson. (Scott Aff. ¶ 3.)

Scott activated his squad car lights; this caused Johnson to step on the gas, hoping apparently to get to his grandmother's house before being arrested. (Scott Aff. ¶ 4; Johnson Dep. 17-18.) Scott gave chase and observed the Chevrolet Caprice fish-tailing on the ice and snow. Scott turned on his siren, but to no effect; Johnson disregarded several stop signs as the two cars proceeded through nine or ten city blocks at speeds in excess of the posted speed limits. (Scott Aff. ¶ 4; Johnson Dep. 19-20.)

Eventually, Johnson approached a road block consisting of two police vehicles at the bottom of a hill with their lights on. (Johnson Dep. 19.) Johnson exited his vehicle and fled on foot. (Scott Aff. ¶ 6; Johnson Dep. 19.) Scott left his squad car and opened the rear door to

7

release Archer. (Scott Aff. ¶ 6.) The record does not reveal that Scott gave any commands to Archer either then or during the subsequent chase.

Johnson, knowing he was being pursued by a police officer, ran through a residential yard where he jumped a chain link fence. (Johnson Dep. 21; Scott Aff. ¶ 7.) The next obstacle was more formidable, a backyard wood fence approximately 4 to 5 feet high and too tall to jump. (Johnson Dep. 22-23.) The area was not well lit. (Johnson Dep. 23.) With nowhere to go, Johnson turned around toward Scott, put his hands in the air and said, "I give up." (Johnson Dep. 26.) By this time, Archer was only six to eight feet away, with Scott only a couple of steps behind. (Johnson Dep. 27.)

Archer immediately grabbed Johnson's left upper arm and as Johnson was being pulled down, Scott's forearm connected with Johnson's chest, knocking him to the ground. (Johnson Dep. 28.) Scott proceeded to handcuff Johnson by placing Johnson's right arm behind his back while Archer held onto Johnson's left arm. (Johnson Dep. 30.) Johnson asserts that he was not resisting but that nevertheless a scuffle ensued, with Scott striking him several times in the middle of the shoulder blades, neck, and the back of the head in an effort to obtain his left arm for handcuffing. (Johnson Dep. 30.)

Apparently the reason Johnson did not comply with Scott's commands to "stop resisting" was because Archer was still holding his left arm and he was trying to pull away from the dog. (Johnson Dep. 30-31.) Eventually, Archer let go of Johnson's arm and started biting his leg, allowing Scott an opportunity to finish the handcuffing. Once Scott had Johnson handcuffed, he quickly told Archer to "let go," and Archer released Johnson within five to ten seconds and never bit him again. (Johnson Dep. 32-34.) Scott never hit Johnson or used any other force after

8

Johnson was handcuffed. (Johnson Dep. 34.) The entire handcuffing incident took about twenty seconds. (Johnson Dep. 32.) Although Johnson did not have a weapon, he acknowledges Scott would not have known that until he was patted down later. (Johnson Dep. 24, 35-36.)

Johnson subsequently pled guilty to resisting law enforcement with a vehicle and possession of under three grams of cocaine, both Class D felonies. (Johnson Dep. 6-7; Scott Aff. ¶ 8.)

### B. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

### C. Discussion

To prevail on his § 1983 excessive force claim, Johnson must prove that Scott: (1) acted under color of state law, a point that is undisputed, and (2) deprived Johnson of some right under

9

the Constitution or the laws of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982); *Ineco v. City of Chicago*, 286 F.3d 994, 997-98 (7th Cir. 2002); *Harbours Pointe of Nashotah, LLC v. Vill. of Nashotah*, 278 F.3d 701, 704 (7th Cir. 2002).

A claim of "excessive force in the course of making an arrest . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Scott*, 127 S.Ct. at 1776 (quoting *Graham*). This gives rise to the overarching question, "whether [the officer's] actions were objectively reasonable." *Scott,* 127 S.Ct. at 1776. In *Scott*, the Court explained that "[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record . . . the reasonableness of [the officer's] actions . . . is a pure question of law." *Id*.

Thus, in "determining the reasonableness of the manner in which a seizure is effected," the court "'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id*. at 1778 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). Therefore, "proper application [of the test] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

At bottom then, the inquiry focuses on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting [him]." *Id*. at 395. This means that

courts must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Consequently, a "police officer's use of force is unconstitutional if, 'judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (citing *Lester v. City of Chicago,* 830 F.2d 706, 713 (7th Cir. 1987)); *see also Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (stating that the court must look to whether the totality of the circumstances justified the seizure).

But, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham,* at 396-97. And if an officer believes that the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, for example, then even deadly force can reasonably be used. *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003); *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002).

In applying this standard, Johnson notably does not dispute the lawfulness of his arrest but argues that after he surrendered, Scott used unnecessary force by: (1) allowing Archer to bite his arm and to continue biting after he was handcuffed; (2) tackling him after Archer grabbed his arm; and (3) hitting him after he lay on the ground handcuffed. (Resp. Br. 5.) In essence, Johnson complains about events both before and after he was handcuffed, but as noted earlier at note 4, there is nothing in either Johnson's deposition or affidavit (after the Court's ruling on the motion to strike) that would support a finding that Scott either hit, or allowed Archer to bite Johnson, after he was handcuffed.

11

What is left then are the events that occurred before Johnson was handcuffed. More precisely, whether Scott's actions were objectively reasonable when he permitted Archer to bite and hold Johnson's left arm while he thumped Johnson to the ground, followed by forearm strikes to Johnson's back, head, and neck while attempting to handcuff him. Although Johnson seems to believe that his last-second surrender means that no force at all should have been applied, he ignores the general, common sense proposition that a stop or an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396; *see Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592-93 (7th Cir. 1997) (holding that where an offender is resisting arrest, an officer can use that amount of force necessary to overcome the offender's resistance), *cert. denied*, 522 U.S. 1116 (1998).

Johnson appears at the outset to be critical of Scott's use of Archer in the arrest. Yet, the use of police dogs to aid in the apprehension of a fleeing suspect is not a *per se* constitutional violation or, standing alone, an unreasonable seizure. *See Miller v. Clark County*, 340 F.3d 959, 962 (9th Cir. 2003); *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 150 (1st Cir. 2003); *Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir. 1994) (affirming summary judgment for defendants and finding use of police dog to seize reckless driver who fled car and hid in woods reasonable); *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1553 (11th Cir. 1989); *Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988); *see also Strickland v. Shotts*, 408 F. Supp. 2d 633, 637 (N.D. Ind. 2004).

Johnson also does not argue that Scott should have issued a verbal warning before deploying Archer, *see, e.g., Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998), no doubt because Scott had no real opportunity to do so given Johnson's head-long flight and surprising, last-second surrender. Moreover, the principle the Fourth Circuit Court of

Appeals applied in *Vathekan* of a required advance warning before deploying a police dog to attack, is limited (as the Fourth Circuit itself now seemingly recognizes, *Estate of Rodgers ex rel. Rodgers v. Smith*, 188 Fed. Appx. 175 (4th Cir. 2006)), to those situations where the officer faces no immediate threat yet deploys a police dog anyway. Clearly, that was not Scott's situation.[6]

More to the point, the use of Archer to apprehend and detain Johnson was objectively reasonable given the severity of the crimes at issue. *Graham*, 490 U.S. at 396. After all, Scott had good reason to believe that the person he was chasing was armed and may have been involved in a shooting. He also had first hand knowledge that the person had refused to stop when confronted with squad car lights and sirens, had been speeding and ignoring stop signs, and had just avoided a police roadblock, all meaning that the person had resisted arrest by fleeing in his car, a Class D felony in Indiana. *See* Ind. Code § 35-44-3-3. These offenses were sufficiently severe that Scott was allowed to use force to effectuate an arrest so as to protect himself and others. *Graham*, 490

---

[6] Johnson does not argue that Scott should have made a split-second judgment, *Graham*, 490 U.S. at 396, and called off Archer before the dog lunged and grabbed his arm. Clearly these were rapidly evolving events, *id.*, and it is entirely likely that in that dark corner of someone's backyard Johnson's raised arms appeared at least suspect, if not menacing to Archer. In any event, since Scott apparently did not command Archer to grab Johnson's arm (Johnson Dep. 26), it is likely that this was an instinctive or trained response from the police dog.
   Moreover, when Johnson suddenly turned with his hands in the air and uttered the words, "I give up," Archer was, by Johnson's estimate, in full pursuit and only six to eight feet away. In that vein, Archer probably did not understand what Johnson was saying or doing, nor can it reasonably be suggested that he had an obligation to heed those words or acts.
   Nevertheless, in arguing that Scott is not entitled to qualified immunity, Johnson did cite to an unpublished Seventh Circuit decision, *Bey v. Cimarossa*, 202 F.3d 272, 2000 WL 12830, at *2 (7th Cir. 1999), that in turn cites *Vathekan*, 154 F.3d at 179, for the proposition that whether the suspect was resisting or attempting to flee or was given an opportunity to peacefully surrender before the police dog was ordered to attack, are material considerations in evaluating the reasonableness of the officer's actions. *Bey*, however, has little applicability here because in that case, the plaintiff claimed that he was not attempting to evade arrest and had received no notice or an opportunity to peacefully surrender before the dog was released. 2000 WL 12830, at *2. *Vathekan* too is easily distinguishable because there an innocent plaintiff was sleeping in her own home and received no notice that a police dog had been released into her residence with the command to search and bite whomever it found in the house. 154 F.3d at 176-77. Here, of course, Johnson had actively fled police and had many opportunities to surrender before ever encountering Archer.

U.S. at 396; *Tilson v. City of Elkhart*, 317 F. Supp. 2d 861 (N.D. Ind. 2003), *aff'd by unpublished order*, 96 Fed. Appx. 413 (7th Cir. 2004).

To any objective observer, the suspect also appeared to pose a safety threat, and his active "resisting or attempting to evade arrest by flight," *Graham*, 490 U.S. at 396, is undeniable. Scott surely knew that he was chasing someone potentially dangerous who was determined to avoid arrest. After all, Scott had good reason to believe that the person was involved in some serious, even violent offenses. Perhaps this person's reckless flight stemmed from, for all Scott knew, a desire to avoid capture because he was wanted for other, more serious crimes, or maybe the suspect wanted to lure the police officer into a darkened ambush where he had some confederates. Perhaps too, the person now on foot was looking for any open door or window, and hostages, in that residential area. Altogether, any police officer clearly would have viewed the suspect as an immediate threat to either himself or others, *id.*, and it was therefore objectively reasonable to employ Archer to assist in the apprehension. *See Miller*, 340 F.3d at 968 (finding that the use of K-9 to bite and hold traffic violation suspect who fled not unreasonable); *Jarrett*, 331 F.3d at 150-51 (same); *Matthews*, 35 F.3d at 1051 (same); *Tilson.* The upshot of this determination blunts what appears to be Johnson's principal argument – that Scott's use of Archer created a situation that then gave rise to the use of unnecessary force.[7]

Indeed, with Archer now fully and properly engaged with the suspect, Scott seemingly had little choice but to also become involved, which he undertook through the use of a forearm strike to Johnson's chest while yelling "get down." (Johnson Dep. 26, 28.) This was followed by

---

[7] Although Johnson seems to suggest that Archer held onto him for about ten seconds after he was handcuffed and that this constitutes excessive force, the contention, even if true, has no merit. *See Miller*, 340 F.3d at 968 (stating that a prolonged bite of a police dog of up to a minute and until deputies arrived did not constitute excessive force as a matter of law).

some forearm blows to the back of Johnson's head (Johnson Dep. 35), and the corresponding statement, "stop resisting" (Johnson Dep. 30), all in an effort to obtain Johnson's left arm, which was still in Archer's grip.

Although Johnson seems to take issue with this so-called tackling, an objectively reasonable police officer confronted with a potentially dangerous suspect struggling with his K-9 partner in the dark would have considered it necessary to rapidly gain a tactical advantage to minimize the suspect's ability to flee, maneuver, or secure a weapon. This was clearly Scott's intent as evidenced by his yelling "get down" together with a blow designed to knock the suspect off balance. The other forearm blows to the back of Johnson's head and Scott's statement, "stop resisting," indicate that he (as would any objectively reasonable police officer) thought the suspect was actively resisting. In fact, Johnson was resisting, or so it would have appeared to Scott, because he was pulling away from Archer to avoid his bite. (Johnson Dep. 31.) In short, apart from whatever Scott's intent may have been, his use of force so as to secure handcuffs on the suspect, and to insure the safety of himself, Archer, and the suspect, was objectively reasonable.

Moreover, police are justified in using a higher degree of force to restrain a suspect whom they reasonably believe to be dangerous or a flight risk. *Thomas v. City of Fort Wayne,* No. 1: 06-CV-320 PS*,* 2008 WL 282348, at *5 (N.D. Ind. Jan. 31, 2008) (citing *Smith v. City of Chicago*, 242 F.3d 737, 743-44 (7th Cir. 2001))(affirming summary judgment for defendant officers who pulled suspect out of his car, pinned his arms behind his back, and slammed him against the hood of his car to handcuff him, where plaintiff continued driving for twelve blocks after police first put their sirens on, yet voluntarily obeyed police commands to unlock his door). Clearly an

15

objectively reasonable police officer would have viewed Johnson, at least until he was handcuffed, as both a risk of flight and a risk of danger, meaning that some higher degree of force was appropriate; yet quite remarkably, Scott did not use a weapon or even closed fists.

It that regard, this case stands in sharp contrast to those that typically survive summary judgment, cases where, for example, there is evidence of gratuitous force after handcuffing done with fists and weapons. *Cf.*, *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007); *Frazell v. Flanigan*, 102 F.3d 877, 885 (7th Cir. 1996), *overruled on other grounds by McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002).

Therefore, viewing the facts in a light most favorable to Johnson, and in total, and in balancing "the amount of force used in relation to the danger posed to the community or to the arresting officers," *Thomas,* 2008 WL 282348, at *4 (citing *Smith,* 242 F.3d at 743-44), we have a situation here where objectively reasonable force was applied as a matter of law.

Accordingly, summary judgment must be granted on Johnson's Fourth Amendment claim.[8]

## IV. CONCLUSION

For the foregoing reasons, Scott's motion to strike (Docket # 48) is GRANTED IN PART and DENIED IN PART. Scott's motion for summary judgment (Docket # 39) is GRANTED for the reasons provided in this Opinion. The Clerk is directed to enter judgment for the Defendant

---

[8] Because Scott is entitled to summary judgment on Johnson's § 1983 claim as a matter of law, the Court does not need to inquire further concerning whether Scott is also entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

and against the Plaintiff.[9]

    SO ORDERED.

    Enter for August 14, 2008.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[9] The Court appreciates the fine representation that Court-appointed counsel provided to Johnson and thanks them for their efforts.